# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS

```
* * * * * * * * * * * * * * * * * * * *
AMY FAULKENBERRY, on behalf  *
of her minor son, WCF,       *
                             *      No. 19-238V
              Petitioner,    *      Special Master Christian J. Moran
                             *
v.                           *
                             *      Filed:  January 5, 2026
SECRETARY OF HEALTH          *
AND HUMAN SERVICES,          *
                             *
              Respondent.    *
* * * * * * * * * * * * * * * * * * * *
```

<u>M. Clay Ragsdale, IV</u>, Ragsdale LLC, Birmingham, AL, for petitioner;
<u>Madelyn Weeks</u>, United States Dep't of Justice, Washington, DC, for respondent.

## PUBLISHED DECISION AWARDING ATTORNEYS' FEES AND COSTS[1]

Pending before the Court is petitioner Amy Faulkenberry's motion for final attorneys' fees and costs.  She is awarded a total of **$153,209.17**.

---

[1] Because this published decision contains a reasoned explanation for the action in this case, the undersigned is required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). This posting means the decision will be available to anyone with access to the internet. In accordance with Vaccine Rule 18(b), the parties have 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy.  If, upon review, the undersigned agrees that the identified material fits within this definition, the undersigned will redact such material from public access.

## I.     Background[2]

WCF was born in July 2014.  Exhibit 11.  WCF visited the office of his pediatrician, Dr. Walker, for his 18-month check up on February 17, 2016.  Exhibit 4 at 168.  During this appointment, WCF received the second dose of the hepatitis A vaccine and flu vaccine.  Id.; see also Exhibit 1 at 1.

Four days later, on February 21, 2016, WCF vomited in a Target store.  An ambulance arrived and he was taken to a local emergency room.  Exhibit 12 at 5-7.  In the emergency room, doctors ran various tests and discharged him.  Exhibit 9 at 74-88.

The following day, Dr. Walker saw WCF.  Dr. Walker diagnosed him with an upper respiratory infection and vomiting.  Exhibit 4 at 167.

The next item in the medical records occurred on March 6, 2016.  WCF had convulsions.  An ambulance again brought him to the hospital.  Exhibit 12 at 10.  This event marks the *latest* date that WCF might have first manifested symptoms of his anti-NMDAR encephalitis.

Over the next few weeks, WCF saw pediatricians and different neurologists.  He was hospitalized for three days.  Exhibit 10 at 5-7.  Eventually, he tested positive for NMDA antibodies.  Id. at 286.

Both experts agree that WCF's diagnosis is anti-NMDAR encephalitis.  Exhibit 22 (Dr. Marcus's report) at 2-4; Exhibit A (Dr. Lancaster's report) at 4.

## II.     Procedural History

### A.     Before the Petition was Filed

According to the attorneys' timesheets, Ms. Faulkenberry first communicated with Clay Ragsdale's law firm in February 2018.  As discussed below, Mr. Ragsdale and another attorney, Allison Espy, represented Ms.

---

[2] Events in WCF's life are presented summarily to provide some context for the actions taken in the litigation.  For more detailed accounts of the medical records, see Pet'r's Br., filed June 6, 2022, at 2-4 and Resp't's Revised Br., filed Feb. 2, 2023, at 2-12.

Faulkenberry.  (Ms. Epsy was formerly known as Allison Riley.)  These attorneys were assisted by various support staff, primarily a paralegal, Amy Johnson.

For about one year, members of the law firm developed evidence.  A primary task was gathering medical records.

### B.    Petition to Expert Report Stage

On behalf of Ms. Faulkenberry, Mr. Ragsdale submitted the petition on February 12, 2019.  Ms. Faulkenberry alleged the flu vaccine and the hepatitis A vaccine caused WCF to develop "acute encephalopathy post immunization and encephalitis/encephalomyelitis following immunization procedure," as well as "severe developmental delay and regression."  Pet., filed Feb. 12, 2019, at 2.  She periodically submitted medical records and affidavits.

Shortly after the case was filed, an initial set of orders was issued.  One order advised the attorneys about creating invoices to support an application for attorneys' fees and costs.  Order, issued Feb. 14, 2019.  This order advised against certain practices such as: "Multiple attorneys working on a case," "Block billing . . . A rule of thumb is that tasks that require more than one hour should be further refined," and "Vague entries."  Mr. Ragsdale and Ms. Espy both charged for reading this order.

The Secretary opposed the claim for compensation.  Resp't's Rep., filed July 31, 2019.  The Secretary maintained that although an appropriate diagnosis was unclear, one possibility was anti-NMDAR encephalitis.  Id. at 11.  (As mentioned above, diagnosis is no longer an issue because after the Secretary filed his report, both experts agreed with the diagnosis of anti-NMDAR encephalitis.)  The Secretary also contended that WCF may have manifested symptoms of anti-NMDAR encephalitis before the vaccination, in particular, that he was fussy and having trouble sleeping by November 2, 2015.  Id. at 12. The Secretary also noted that Ms. Faulkenberry had not presented a report from a treating doctor or from a retained expert that causally connected the vaccinations to WCF's condition.  Id. at 12.

To facilitate the presentation of reports from experts, a set of instructions were proposed.  When the parties did not object, the instructions became final.  Order, issued Jan. 27, 2020.

3

### C.    Expert Report Stage

The parties submitted a series of reports from experts.  Ms. Faulkenberry retained Dr. Lydia Marcus.  Dr. Marcus is a board-certified pediatric neurologist.  Exhibit 23 (curriculum vitae).  Since 2019, she has been an assistant professor of pediatrics at the University of Alabama-Birmingham.  At the time of her first report, she had written three articles published in peer-reviewed journals.  Id. at 4.  Another article reporting on a series of patients with anti-NMDAR encephalitis was pending review.  Exhibit 22 at 1.  In her first report, Dr. Marcus stated that she has treated approximately nine cases of anti-NMDAR encephalitis.  Id.

Dr. Marcus's first report is approximately five pages with an additional one and a half pages for references.  Exhibit 22.  Her report generally complies with the Expert Instructions.  Dr. Marcus has charged 6.25 for her work on the first report.[3]  As discussed below, Attorney Ragsdale, Attorney Espy, and Ms. Johnson also contributed to the preparation of Dr. Marcus's report.  These legal professionals have charged more than 25 hours for their work.

The Secretary's expert is Dr. Lancaster.  Dr. Lancaster is board certified in neurology.  Exhibit B (curriculum vitae).  He has "expertise in antibody-mediated neurologic disorders."  Id. at 1.  Dr. Lancaster "completed several years of research fellowship at the University of Pennsylvania under the mentorship of Josep Dalmau, MD, PhD, who discovered anti-NMDAR encephalitis."  Exhibit A (report) at 1.  Dr. Lancaster has written more than 30 peer-reviewed articles, some of which concern anti-NMDAR encephalitis.  Exhibit B at 5-7.  At time of his first report, Dr. Lancaster had treated approximately 50 patients with anti-NMDAR encephalitis.  Exhibit A at 1-2.  The 50 patients appear to be all adults, not children.  Dr. Lancaster disagreed with some of the opinions Dr. Marcus had offered.

Ms. Faulkenberry obtained a supplemental report from Dr. Marcus.  Exhibit 54.  Dr. Marcus has charged four hours for preparing her report.[4]  This report, which is dated June 10, 2021, is five pages with Dr. Marcus's signature on the

---

[3] The expert invoices are contained within Exhibit C to the pending application for fees and costs.  The pages within Exhibit C are not numbered.

[4] Dr. Marcus's second invoice contains billing of three hours.  However, her third invoice begins with a June 10, 2021 charge of one hour.

4

sixth page.  Attorney Ragsdale and Attorney Epsy again contributed to preparing this report.  They charged more than 18 hours of time.

Dr. Lancaster responded in a second report.  Exhibit C.  The submission of Dr. Lancaster's second report appeared to complete the disclosure of reports from experts.  Ms. Faulkenberry affirmatively stated that an additional response was not required.  Pet'r's Status Rep., filed Nov. 24, 2021.

### D.    Briefing Stage

Thus, the parties were directed to file briefs.  Order, issued Jan. 21, 2022.  This order alerted the parties that the case might be resolved on the papers.  Ms. Faulkenberry submitted three affidavits, one from WCF's father, one from WCF's grandmother, and one from her.  Exhibits 46-48.  The affiants generally described WCF's health from February 21, 2016 (the date of the trip to Target) through his hospitalization in March 2016.  The affiants also affirmed the accuracy of video testimony and incorporated that material.  However, Ms. Faulkenberry did not submit any video testimony at this time.  The time spent on preparing the onset material exceeded 25 hours.

Ms. Faulkenberry argued that she was entitled to compensation in her primary brief filed July 6, 2022.  Including an addendum, the brief is 39 pages.  Ms. Faulkenberry's legal team has charged for more than 140 hours drafting the brief.

In the context of Ms. Faulkenberry's initial set of materials, she submitted a third report from Dr. Marcus.  Exhibit 54, dated July 2, 2022.  This report is approximately three pages with her signature and a list of references appearing on a fourth page.  Dr. Marcus's has invoiced for nine hours from October 25, 2021 through July 6, 2022.  For their work on Dr. Marcus's third report, Attorney Ragsdale, Attorney Espy, and Ms. Johnson have billed more than 20 hours.

In compliance with the order scheduling briefs, the Secretary submitted his brief on September 6, 2022.  The Secretary did not add another report from Dr. Lancaster.  The Secretary noted that Ms. Faulkenberry had referenced but not actually submitted video testimony.  Resp't's Br., filed Sep. 6, 2022, at 11.

Ms. Faulkenberry submitted new videos and transcripts of the testimony created by a court reporter.  Exhibits 60-62; see also CM/ECF 84.  This testimony again mostly concerns whether WCF suffered from an infection when he was at

Target.  Because Ms. Faulkenberry submitted evidence after the Secretary filed his brief, the Secretary submitted a revised brief on February 2, 2023.

Ms. Faulkenberry further argued her case.  Pet'r's Reply, filed Mar. 27, 2023.  This brief is essentially 10 pages.  There are two lines of text on the eleventh page and the certificate of service is on page 12.  For this work, the attorneys have charged more than 30 hours.

Ms. Faulkenberry was found not entitled to compensation.  The Entitlement Decision is approximately 26 pages.

### E.    Motion for Review

Ms. Faulkenberry challenged the outcome by filing a motion for review. The memorandum accompanying the motion for review is 20 pages.  From November 1, 2024 through January 2, 2025, inclusive, Attorney Ragsdale and Attorney Espy charged approximately 45 hours for this brief.

The Court denied the motion for review.  The Court's opinion is approximately 11 single-spaced pages.  Over the next two weeks, Attorney Ragsdale and Attorney Espy spent more than 6 hours reviewing the Opinion and considering whether to appeal to the Federal Circuit.  Ms. Faulkenberry did not appeal, ending the entitlement phase of the case.

### F.    Fees

Beginning as early as March 28, 2023, the legal team spent time on the fee request.  Overall, the amount of billed time for the fee application exceeds ten hours.

Ms. Faulkenberry requests an award of $195,653.17.  Pet'r's App'n, filed June 2, 2025.  Nearly all of this request is for attorneys' fees.  Ms. Faulkenberry stated that she did not incur any costs personally.  Pet'r's App'n, Exhibit D.

The Secretary submitted his boilerplate response, deferring to the special master's assessment.

## III.    <u>Eligibility for Attorneys' Fees</u>

Although compensation was denied, petitioners who bring their petitions in good faith and who have a reasonable basis for their petitions may be awarded

attorneys' fees and costs.  42 U.S.C. § 300aa-15(e)(1).  In this case, although petitioner's claim was ultimately unsuccessful, good faith and reasonable basis existed throughout the matter.  Respondent has also indicated that he is satisfied that the claim has good faith and reasonable basis.  Respondent's position greatly contributes to the finding of reasonable basis.  See Greenlaw v. United States, 554 U.S. 237, 243 (2008) ("[W]e rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present.").  A final award of reasonable attorneys' fees and costs is therefore proper in this case and the remaining question is whether the requested fees and costs are reasonable.

## IV.    Reasonable Amount of Attorneys' Fees and Costs

In light of the Secretary's lack of objection, the undersigned has reviewed the fee application for its reasonableness.  See McIntosh v. Sec'y of Health & Human Servs., 139 Fed. Cl. 238 (2018).  Ms. Faulkenberry's application is divided into two components: attorneys' fees and attorneys' costs.

### A.    Reasonable Attorneys' Fees

The Federal Circuit has approved the lodestar approach to determine reasonable attorneys' fees and costs under the Vaccine Act.  This is a two-step process.  Avera v. Sec'y of Health & Human Servs., 515 F.3d 1343, 1348 (Fed. Cir. 2008).  First, a court determines an "initial estimate … by 'multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate.'"  Id. at 1347-48 (quoting Blum v. Stenson, 465 U.S. 886, 888 (1984)).  Second, the court may make an upward or downward departure from the initial calculation of the fee award based on specific findings.  Id. at 1348.  Here, because the lodestar process yields a reasonable result, no additional adjustments are required.  Instead, the analysis focuses on the elements of the lodestar formula, a reasonable hourly rate and a reasonable number of hours.

#### 1.    Reasonable Hourly Rates

Under the Vaccine Act, special masters, in general, should use the forum (District of Columbia) rate in the lodestar calculation.  Avera, 515 F.3d at 1349.  There is, however, an exception (the so-called Davis County exception) to this general rule when the bulk of the work is done outside the District of Columbia and the attorneys' rates are substantially lower.  Id. 1349 (citing Davis Cty.  Solid Waste Mgmt. and Energy Recovery Special Serv. Dist. v. U.S. Envtl.  Prot.

Agency, 169 F.3d 755, 758 (D.C. Cir. 1999)).  In this case, all the attorneys' work was done outside of the District of Columbia.

Ms. Faulkenberry proposes various rates for the legal professionals.  For Mr. Ragsdale, hourly rates range from $410.00 per hour to $580 per hour.  For Ms. Espy, hourly rates range from $280 per hour to $480 per hour.  For Ms. Johnson, hourly rates range from $150 per hour to $195 per hour.  Pet's App'n at 7-8.  These rates are accepted as reasonable.  See Williamson v. Sec'y of Health & Human Servs., No. 23-1149V, 2025 WL 2742024 (Fed. Cl. Spec. Mstr. Aug. 26, 2025).

The acceptance of these proposed rates comes with a caveat.  When attorneys are paid relatively high hourly rates because of their skills and experiences, the attorneys are expected to be efficient.  Professionals who charge by the hour should not both charge a relatively high hourly rate and charge a relatively high number of hours.  See Broekelschen v. Sec'y of Health & Hum. Servs., 102 Fed Cl. 719, 731 (2011).  As discussed below, the legal professionals have not adequately justified the number of hours for which they are invoicing.[5]

## 2.    Reasonable Number of Hours

The second factor in the lodestar formula is a reasonable number of hours. Reasonable hours are not excessive, redundant, or otherwise unnecessary.  See Saxton v. Sec'y of Health & Human Servs., 3 F.3d 1517, 1521 (Fed.  Cir. 1993). The Secretary also did not directly challenge any of the requested hours as unreasonable.  Nevertheless, several topics merit attention.

### a)    Dual Attorneys

In the Vaccine Program, assigning multiple attorneys to work on a case is disfavored due to the inefficiencies created in what are not typically procedurally complex cases.  See Raymo v. Sec'y of Health & Hum. Servs., 129 Fed. Cl. 691, 703 (2016); Sabella v. Sec'y of Health & Hum. Servs., 86 Fed. Cl. 201, 214–15 (2009); Breault v. Sec'y of Health & Hum. Servs., No. 22-1220V, 2025 WL 2028524, at *5 (Fed. Cl. Spec. Mstr. June 25, 2025); Grossman v. Sec'y of Health & Hum. Servs., No. 18-13V, 2024 WL 706874, at *2 (Fed. Cl. Spec. Mstr. Jan. 26,

---

[5] Keeping the hourly rate constant allows for an adjustment to the number of hours discussed below.  An alternative method would be to decrease the hourly rate but accept the number of hours.  Mathematically, each approach results in the same answer.

2024); <u>Austin v. Sec'y of Health & Human Servs.</u>, No. 10-362V, 2013 WL 659574, at *14 (Fed. Cl. Spec. Mstr. Jan. 31, 2013); <u>Soto v. Sec'y of Health & Human Servs.</u>, No. 09–897V, 2011 WL 2269423, at *6 (Fed. Cl. Spec. Mstr. June 7, 2011); <u>Carcamo v. Sec'y of Health & Human Servs.</u>, No. 07–483V, 2011 WL 2413345, at *7 (Fed. Cl. Spec. Mstr. May 20, 2011). Outside of the Vaccine Program, the Court of Federal Claims has declined to award attorneys' fees when cases are overstaffed. <u>Hippely v. United States</u>, 173 Fed. Cl. 389, 425 (2024); <u>Brass v. United States</u>, 127 Fed. Cl. 505, 513 (2016).

Here, from a legal perspective, Ms. Faulkenberry's case was not especially complicated. Admittedly, one unusual aspect was that the parties disputed whether WCF might have manifested his anti-NMDAR encephalitis before his vaccination. Although questions of onset are not typical in the sense that in the majority of cases, the parties agree that the allegedly causal vaccination preceded the disease, questions of onset do come up from time-to-time. In the undersigned's experience, single attorneys with the assistance of paralegals routinely represent petitioners in cases when onset is disputed.

From a medical perspective, Ms. Faulkenberry's case was relatively routine. Arguably, the case might be slightly more difficult because anti-NMDAR encephalitis is a disease that has been recognized relatively recently. But, the recurring question is whether sufficient evidence shows that a vaccine can cause the disease. In this sense, whether flu vaccine can cause anti-NMDAR encephalitis is simply a variation on a common theme.

Thus, Ms. Faulkenberry's case does not fit at the extreme end of the complexity spectrum. It is not readily apparent that the extensive involvement of both Mr. Ragsdale and Ms. Espy was required. Instead, Mr. Ragsdale and Ms. Espy appear, in many instances, to duplicate work, resulting in the inefficiencies about which <u>Sabella</u> and other cases have warned. One example is after the Secretary recommended against an award of compensation. On April 15, 2020, Mr. Ragsdale spent 2.0 hours reviewing the Rule 4 report and other material including literature on anti-NMDA encephalitis. On the same day, Ms. Espy spent 0.5 hours also reviewing the Rule 4 report and other materials, including the medical records. For almost all firms in the Vaccine Program, these tasks would have been performed by a single attorney, eliminating a duplication in effort.

Moreover, the combined efforts of Mr. Ragsdale and Ms. Espy did not produce an amazingly excellent representation that widely exceeded the work other attorneys perform. To be clear, Mr. Ragsdale and Ms. Espy competently

9

represented Ms. Faulkenberry and zealously advocated for her.  In general, there is little concern about the quality of the representation, although there are extensive concerns about the quality of the *billing* for the work.

Most of the duplication of efforts occurred in discrete stages discussed below.  To avoid any inappropriate double-reductions, the reduction for the more general duplication in efforts will be a modest $500.00.

*b)*    *Excessive Charges for Discrete Tasks*

Counsel "should make a good faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission."  Hensley v. Eckerhart, 461 U.S. 424, 434 (1983).

Here, during various stages, the fee application requests compensation for an excessive and unreasonable amount of time for specific tasks.  Some of the excessive charges are discussed in the context of larger projects, such as writing briefs, and those will be analyzed below.  But, this portion of the decision concerns relatively isolated duties.

One example derives from the issuance of an order on January 19, 2023. Excluding the caption and signature block, the order is approximately one page. Essentially, the order states (a) the Secretary filed a brief---something about which Ms. Espy was aware, (b) after the Secretary filed his brief, Ms. Faulkenberry submitted additional evidence---something about which Ms. Espy was also aware, so (c) the Secretary was permitted additional time to modify its brief to discuss the recently submitted evidence.  The January 19, 2023 scheduling order cited no cases.  The reading and processing of such a short order can probably be accomplished by an experienced attorney, such as Ms. Espy, in less than five minutes.  Thus, the expected time entry is 0.1 hours.  However, for reviewing this short order, Ms. Espy has charged 24 minutes.

Another example derives from an earlier scheduling order, issued on October 8, 2020.  There is actually not any written order, only a non-pdf entry on the Court's docket, setting the deadline for respondent's expert report.  (The deadline was based upon the September 10, 2020 schedule order.)  Again, for this type of entry, an attorney could spend a minimal amount of time.  So minimal that charging a client may not even be appropriate.  But, if time were to be charged, the

time involved could not have exceeded 6 minutes.  Mr. Ragsdale has charged 0.2 hours.

These examples are brought forward to show that for some activities about which the undersigned has direct knowledge, Ms. Espy and Mr. Ragsdale have exceeded the bounds of reasonableness.  (In this context, "direct knowledge" refers to the fact that the undersigned can read the same scheduling orders.)  When Ms. Espy and Mr. Ragsdale have invoiced too much for activities that can be monitored, this practice calls into question the accuracy of other charges that cannot be verified so easily.

Although the undersigned does not have as much "direct knowledge" about all tasks, the undersigned has experience from reviewing fee applications.  See Saxton v. Sec'y of Health & Human Servs., 3 F.3d 1517, 1521 (Fed. Cir. 1993) (allowing special masters to rely upon their experience in adjudicating fee applications).  This experience leads to question about other charges that are also unreasonable.  For example, by way of background, on October 8, 2021, Mr. Ragsdale charged 1.5 hours for reviewing Dr. Lancaster's report.  In the undersigned's experience, attorneys usually do not spend that much time reviewing the report from the government's expert because the person who will respond is the petitioner's expert (not the attorney).  But, for purposes of analysis, the benefit of the doubt is extended to Mr. Ragsdale and this time can be credited.  His review of Dr. Lancaster's report is a foundation for a more questionable item.

On October 25, 2021, a status conference was held, and Mr. Ragsdale has charged 1.0 hour for "prep for sc."  In the undersigned's experience, attorneys typically do not spend this much time for a relatively routine status conference.  The primary topic was whether Ms. Faulkenberry wanted to respond to Dr. Lancaster's report.  In the status conference, Mr. Ragsdale stated that he had not consulted with Dr. Marcus.  Thus, he requested 30 days to figure out whether a response was needed.  See Order, issued Oct. 25, 2021.  Again, in terms of representing Ms. Faulkenberry, there is nothing wrong with Mr. Ragsdale's desire to confer with Dr. Marcus.  But, the question is: does it take 60 minutes to determine that you have not spoken with your expert?

By way of contrast, a slightly more informative entry came from Mr. Ragsdale on April 8, 2021, when he charged 1.8 hours for "prep for SC and review of nmdar decisions; assess onset Althen 3 issue and review of med records re prodromal symptoms."  This entry is better because it provides some details about the nature of the preparation.  However, the entry falls short of an ideal entry in

that Mr. Ragsdale has combined at least two discrete tasks (reviewing NMDAR opinions and assessing the onset issue) into one block billed entry. Furthermore, naming the NMDAR cases would facilitate a review of the reasonableness of the time spent on this activity. See Ginsberg v. Sec'y of Health & Hum. Servs., No. 19-222, 2025 WL 3293707, at *5 (Fed. Cl. Nov. 7, 2025) (denying motion for review of a portion of a decision reducing attorneys' fees because the attorney spent an excessive amount of time repeatedly reviewing cases). As the proponent of the fee request, Mr. Ragsdale bears the burden of creating time entries that explain what he was doing. Pickens v. Sec'y of Health & Hum. Servs., No. 17-187V, 2020 WL 414442, at *5 (Fed. Cl. Jan. 9, 2020) (denying motion for review of decision reducing attorneys' fees when attorney created ambiguous time entries).

As with the previous category of duplication of attorney work, fewer instances of excessive charging for discrete tasks occurred in the more general flow of the litigation as compared with the phases discussed below. Thus, the reduction for this part is limited to $500.00.

### c)    Paralegals Billing for Clerical Work

Under various fee-shifting regimes, attorneys may charge for tasks performed by paralegals. The justification is that the paralegal is stepping in for an attorney and charging a lower hourly rate for work an attorney would otherwise perform. However, attorneys may not charge for clerical tasks because the attorney's hourly rate reflects overhead expenses, such as employing a secretary. Missouri v. Jenkins, 491 U.S. 274, 288 n.10 (1989); Bennett v. Dep't of Navy, 699 F.2d 1140, 1145 n.5 (Fed. Cir. 1983); Guy v. Sec'y of Health & Human Servs., 38 Fed. Cl. 403, 407-08 (1997).

The dichotomy between paralegal activities (billable) and clerical activities (non-billable) is often announced. However, a general principle to differentiate them is somewhat elusive. To qualify as a paralegal, a person needs special training and experience. See Impresa Construzioni Geom. Demenico Garufi v. United States, 100 Fed. Cl. 750, 768 (2011); see also Pressly v. United States, No. 18-1964, 2025 WL 1780947, at *12 (Fed. Cl. May 12, 2025); Pet'r's Mot. at 8 (describing qualifications of paralegals). Thus, one way to categorize whether activities can be billed is to ask whether the activity required special skills.

A typical example of a duty paralegals perform is the summarization of medical records. See Fields for Estate of Lawrence v. Sec'y of Health & Hum.

12

Servs., No. 17-1056V, 2022 WL 3569300, at *4 (Fed. Cl. Spec. Mstr. July 27, 2022) (reducing attorney's fees by approximately $17,000 because an attorney, not a paralegal, summarized medical records), mot. for rev. denied, 2022 WL 4100173 (Fed. Cl. Aug. 23, 2022). The person reading and condensing the medical records must have knowledge of the claim and how specific medical records could be relevant to a claim. For example, with WCF's anti-NMDAR encephalitis, all records created by a neurologist are highly relevant. But, any records from a gastroenterologist are probably less relevant and would not need to be summarized in as much detail as the records from a neurologist. Paralegals at the law firm spent hours summarizing medical records. Time spent summarizing medical records is reasonable.

However, paralegals also performed tasks that do not require any special training. For example, paralegals charged for compiling and organizing records. See, e.g. entries for Nov. 27-28, 2018; Sep. 23, 2020; April 2, 2021. Paralegals also charged for adding a cover page, case caption, and exhibit number to the filing of medical records. Entry for Oct. 22, 2019. But, these activities do not require any special training. To be clear, there is no prohibition on performing clerical tasks. Some clerical tasks are essential, such as filing documents. But, the employment of the person who can perform clerical tasks is built into the attorneys' high hourly rate as part of overhead. See Pickens, 2020 WL 414442, at *4 (denying motion for review of a decision reducing attorneys' fees and stating "legal training is not required to notify the Court that a document is being filed").

Here, $3,000.00 will be removed from the attorneys' fees to account for paralegals charging for clerical tasks. This amount is intentionally set at a low amount, in part, because the Secretary did not interpose any objections. See Vaccine Rule 13(a)(3). If the billings do not improve, larger deductions can be made in the future.

### d) First Expert Report

Beginning on June 1, 2020, Mr. Ragsdale worked to prepare an expert's report. Some of the preliminary work was with a "potential expert." E.g. Entry for June 2, 2020. Although Mr. Ragsdale's entry does not identify the person, Dr.

Marcus's invoice states she spoke on the phone on this date. First Marcus Invoice.[6]

Dr. Marcus spent a small amount of time (1.25 hours) reviewing records. Then, about a month later, she spent 2.5 hours researching and drafting the expert opinion. First Marcus Invoice (entries for July 8-9, 2020).

Mr. Ragsdale reviewed a draft report on July 23, 2020. In this week, he spent about 4.2 hours reviewing the report, identifying areas for the expert to address, and preparing questions for the expert. Mr. Ragsdale was charging $430.00 per hour for this work.

The invoices do not reflect that anyone was doing any work in August 2020. But, then starting on September 4, 2020, Mr. Ragsdale picked up the assignment. From September 4, 2020 through September 16, 2020, Mr. Ragsdale spent approximately five hours editing the report, restructuring the report, and reviewing medical literature. Mr. Ragsdale and Dr. Marcus conferred by telephone on September 16, 2020.

Mr. Ragsdale spent approximately three hours in the next week revising the report to conform to the Expert Instructions. (It is not entirely clear why this time was needed as, presumably, the first drafts of the report could have been structured around the Expert Instructions.) In this time, Dr. Marcus contributed by spending 1.5 hours researching and drafting her opinion. Dr. Marcus's final entry with respect to her first report was on September 22, 2020.

After Dr. Marcus's final entry, the attorneys continued to work on the report. On September 30, 2020, Mr. Ragsdale revised the report for 0.9 hours and a paralegal also continued to edit the report. It is not entirely clear why a paralegal was editing the report when Mr. Ragsdale was already editing it. In any event, it bears noting that the paralegal's September 30, 2020 entry states that she communicated with the expert about the edits.

On October 2, 2020, Ms. Espy joined the group who was working on Dr. Marcus's first report. Over the next few days, Ms. Espy spent approximately five hours studying and highlighting articles on which Dr. Marcus was relying. In the

---

[6] Dr. Marcus prepared three invoices corresponding to different reports she prepared. All invoices are contained in the documents supporting the fee motion.

undersigned's experience, attorneys typically do not spend so much time reviewing articles at this stage, although maybe the attorneys should spend this much time.

On behalf of Ms. Faulkenberry, the law firm filed Dr. Marcus's first report as Exhibit 22 on October 7, 2020. The report is five pages plus about one and a half pages for a list of 18 references.

In sum, the law firm charged for more than 20 hours of work on activities relating to preparing Dr. Marcus's report, worth more than $10,000.00. Dr. Marcus, herself, has invoiced for 6.5 hours of work and charged $3,125.00.

The invoices from the law firm and Dr. Marcus suggest that the preparation of the expert report was a cooperative endeavor. Dr. Marcus wrote the first draft of the report, which the attorneys revised. Dr. Marcus also appears to have offered some guidance during the September 16, 2020 phone call with Mr. Ragsdale. It does not appear that the attorneys dominated the presentation of the report.

Nevertheless, the amount---whether in hours or dollars---exceeds the bounds of reasonableness. The report is only five pages long. Of the five pages, the first two mostly consist of sections about Dr. Marcus's qualifications and the facts about WCF's medical history. Exhibit 22. These two pages cannot have taken much time to write. The remaining approximately three pages contain the medicine / science, which has some complexity. But, in the undersigned's experience, the combination of a doctor and an attorney can write approximately three pages in less than 20 hours.

To account for the inefficiencies and duplication in efforts, $4,000.00 is removed from the attorneys' fees. All of Dr. Marcus's time is credited.

e)    *Second Expert Report*

The next significant task was responding to Dr. Lancaster's report, which was approximately 11 pages. Exhibit A. This work began on April 6, 2021, when Ms. Espy conferred with Dr. Marcus. Around this time, both Mr. Ragsdale and Ms. Espy spent time (roughly 6 hours) reviewing Dr. Lancaster's report. In the undersigned's experience, attorneys do not usually spend so much time reviewing the report of the Secretary's expert.

In May, Mr. Ragsdale spent about 7 hours summarizing Dr. Lancaster's report and selecting medical literature and texts to provide to Dr. Marcus. These

activities are excessive because Mr. Ragsdale is duplicating work that he already performed and because experts should be familiar with the literature in their field.

On June 7, 2021, Dr. Marcus spent 0.5 hours drafting her rebuttal report. Second Marcus Invoice.  Over the next few days, Mr. Ragsdale edited and revised the report for about 3.5 hours.

Dr. Marcus's rebuttal report was filed as Exhibit 44.  It is essentially five pages.  (A signature block appears on the sixth page.)  Dr. Marcus cited no new literature.

Overall, Dr. Marcus charged for 4 hours of work at a value of $2,000.00.[7] The law firm charged for approximately 18 hours of work at a value of more than $8,000.00.

Dr. Marcus's rebuttal report is generally fine.  However, in some parts, it seems clear that Mr. Ragsdale is speaking through her.  Dr. Marcus's report states:

> Although the findings of these studies may not prove with scientific certainty the mechanism by which vaccines in question are capable of inducing encephalitis, they strengthen the reliability of the theory that the vaccines involved trigger the onset of the condition. Overcoming Dr. Lancaster's criticism would require proof of biologic mechanisms at a level that is beyond the current state of scientific understanding, and which is unnecessary to establish the reliability of molecular mimicry as a theoretical framework.

Exhibit 44 at 5.  Usually, doctors do not opine about whether a level of proof is necessary or unnecessary.  These arguments are more appropriately made by attorneys.

As with Dr. Marcus's first report, all of Dr. Marcus's time can be credited as reasonable.  However, Mr. Ragsdale spent an excessive amount of time to produce a five-page report.  Thus, $2,000.00 is removed from attorneys' fees.

---

[7] The first line of Dr. Marcus's third invoice reflects work preparing her second report.

*f)    Preparation of Initial Brief*

Following Dr. Lancaster's response to Dr. Marcus's second report, the parties were directed to argue their positions through briefs.  Order, issued Jan. 21, 2022.  Mr. Ragsdale started this process on February 3, 2022.

Preparing the brief was very much a team effort.  Mr. Ragsdale and Ms. Espy worked on it.  The paralegal also worked on it.  For example, on April 11, 2022, the paralegal "studied medical records to accurately quote and cite."  This activity is reasonable.  (However, it appears that the paralegal double-billed for this work as there is a second entry for the same work on the same day.)  In sum, the legal professionals spent more than 140 hours and charged more than $55,000 on preparing a brief.[8]

The legal professionals deserve credit for specifying aspects of the brief on which they were working.  For example, on April 21, 2022, Ms. Espy spent 1.8 hours researching "encephalopathy in program w particular similarities to causation theory."  By way of contrast, the attorneys have relatively few entries stating something like "Work on Brief."  But see Entry for July 5, 2022 ("Draft brief – all sections").

The law firm submitted Ms. Faulkenberry's primary entitlement brief on July 6, 2022.  On this date, Ms. Faulkenberry also filed another three declarations regarding onset, which are discussed below.  The entitlement brief is 39 double-spaced pages.  The quality of the brief is fine.  Ultimately, the evidence did not favor an award of compensation to Ms. Faulkenberry.  So, in that sense, the brief failed to be persuasive.  But, the brief did not have any glaring deficiencies.

Nevertheless, the amount of time spent on the brief exceeds reasonable bounds.  In the undersigned's experience, attorneys who charge rates similar to Mr. Ragsdale and Ms. Epsy can produce a brief of similar quality and of similar length is much less time.  See Ginsberg v. Sec'y of Health & Hum. Servs., No. 19-222V, 2025 WL 2505773, at *2 (Fed. Cl. Spec. Mstr., Aug. 8, 2025) (generally accepting an attorney's charge of approximately 24 hours for writing a brief that is approximately 23 pages), mot. for rev. denied in part and granted in part, 2025 WL

---

[8] With a standard 40-hour work-week, one attorney would have spent three and a half weeks doing nothing other than writing this brief.

3293707 (Fed. Cl. Nov. 7, 2025); see also Tullio v. Sec'y of Health & Hum. Servs., No. 15-0051V, 2021 WL 5854057, at *2 (Fed. Cl. Spec. Mstr. Nov. 10, 2021) (awarding approximately 40 hours for writing about 20 pages for a motion for review); Pickens v. Sec'y of Health & Hum. Servs., No. 17-187V, 2021 WL 4893583, at *3 (Fed. Cl. Spec. Mstr., Sep. 15, 2021) (reducing the time spent on a 15-page memorandum due to duplication); Crespo v. Sec'y of Health & Hum. Servs., No. 15-1100V, 2018 WL 3991263, at *3 (Fed. Cl. Spec. Mstr., July 5, 2018) (awarding 19 hours for writing a 25-page motion for review); Caves v. Sec'y of Health & Hum. Servs., No. 07-443V, 2012 WL 6951286, at *8-9 (Fed. Cl. Spec. Mstr., Dec. 20, 2012) (reducing time spent on a 30-page motion for review to 16.3 hours because the motion for review duplicated previous submissions), mot. for rev. denied on non-relevant grounds, 111 Fed. Cl. 774 (2013).

One example of where an excessive amount of time was spent concerns the Jedidi article, which Ms. Faulkenberry filed in conjunction with her brief as Exhibit 50. The article fits within two pages, which have unusually wide margins. Ms. Faulkenberry discusses Jedidi in a single paragraph, which contains two sentences. Pet'r's Br., filed July 6, 2022, at 17. (Jedidi is also cited in footnotes 10 and 21). For an analysis of this article, Mr. Ragsdale has charged 1.5 hours. Entry for April 18, 2022. It is difficult to see how the work on Jedidi can exceed more than 30 minutes. In other words, Mr. Ragsdale has charged at least three times as much for reading and incorporating this article into the brief as reasonable. See Ginsberg, 2025 WL 3293707, at *4-5 (denying motion for review that challenge a reduction for reading an article).

Other examples include duplication in topics or at least a vagueness in explaining what was being done. Work on the Daubert factors was done on April 15, 2022 (Mr. Ragsdale 2.5 hours); on May 16, 2022 (Mr. Ragsdale 2.9 hours); on May 17, 2022 (Mr. Ragsdale 1.5 hours); June 8, 2022 (Mr. Ragsdale 3 hours); June 13, 2022 (the paralegal for 1 hour twice); and June 14, 2022 (Mr. Ragsdale 1.5 hours). The portion of the brief that most specifically addresses the Daubert factors covers approximately five pages without citing any cases beyond Daubert. See Pet'r's Br. at 22-25. Similarly, sections on "credibility" were written on April 15, 2022 (Mr. Ragsdale 2 hours); June 9, 2022 (Mr. Ragsdale 2.5 hours); June 13, 2022 (paralegal 0.5 hours twice); July 4, 2022 (Mr. Ragsdale 4.7 hours); and July 6, 2022 (Mr. Ragsdale 2 hours). The term "credibility" primarily appears in a portion of the brief captioned "demeanor of expert," which is approximately one page.

Overall, to achieve the goal of awarding a reasonable amount of compensation, a total of $20,000 is removed (or approximately one-third) of the billing for preparing the primary brief.

### g) Onset Material

In conjunction with the primary brief, Ms. Faulkenberry also submitted three declarations on July 6, 2022. Exhibits 46-48. There are at least two reasons for filing the affidavits: first, Dr. Lancaster had raised some questions about when WCF manifested an episode of his neurologic disorder (see Exhibit A at 2) and second, the briefing order advised that the case might be resolved without any oral testimony. Thus, the plan to obtain more information from people knowledgeable about WCF's condition was sensible.

At the beginning of this process, the paralegal took the lead. She prepared the first statement regarding onset. Entry for Apr. 26, 2022. Ms. Espy then reviewed the draft declarations and compared them to the medical records. Entry for May 9, 2022 (1.5 hours).

Charging half his normal hourly rate, Mr. Ragsdale traveled to meet with his client and other family members. Entry for May 11, 2022.[9] Mr. Ragsdale spent more than 4 hours preparing the anticipated affiants. Entries for May 12, 2022. Although not directly indicated on the time entries, the witnesses answered questions orally and they were videotaped.

In the next week, the legal professionals continued to work on the witnesses' statements. A paralegal spent one hour reviewing the videos and preparing statements for each of three witnesses. Mr. Ragsdale edited the declarations for one hour. Entry for May 31, 2022. On the same day, a paralegal also edited the declarations. Then, after the declarations were finished, paralegals coordinated the signing of the declarations.

---

[9] Mr. Ragsdale charged for traveling to his client twice---once on May 11, 2022 and again on May 12, 2022. He charged for returning on May 13, 2022. The double-charging for travel to the client leads to questions about the accuracy of Mr. Ragsdale's billing entries.

Each of the three declarations are approximately three pages. They tell stories independently, meaning that blocks are not copied from one declaration to the next. They do not cite any medical records. Exhibits 46-48.

For the work of producing these three affidavits, the legal professionals have charged more than 20 hours of work, worth more than $7,000.00. (These numbers include the time and expense of Mr. Ragsdale's travel.) The question is whether these efforts are reasonable.

As a concept, obtaining videotaped statements is fine. Although few attorneys in the Vaccine Program present videotaped statements, videotaping of oral testimony is permitted. See Vaccine Rule 8(b)(2). The undersigned does not want to restrict the ways attorneys representing petitioners in the Vaccine Program, such as Mr. Ragsdale, present their cases.

On the other hand, this process reflects another situation in which multiple people were involved, duplicating efforts. For example, if Mr. Ragsdale will question the witnesses on the videotape, then he (and not Ms. Espy) should be reviewing the medical records. Likewise, if Mr. Ragsdale is editing the declarations, then the paralegal's additional edits appear superfluous. Accordingly, $1,000 will be deducted. This deduction accounts for the duplication of Mr. Ragsdale's travel to his client's location.

> h)    *Preparation of Dr. Marcus's Third Report*

The final item filed on July 6, 2022 was Dr. Marcus's third report. It is three pages of text plus a signature block and list of five references on a fourth page. Exhibit 54.

Work on this report began around March 24, 2022, when Mr. Ragsdale and Dr. Marcus spoke. Without much being listed on an invoice, Mr. Ragsdale and Dr. Marcus communicated again on April 26, 2022 for about one hour.

It appears that the legal professionals took the lead in drafting this report. After Dr. Marcus offered some "detailed planning" on April 26, 2022, people in the law firm were reviewing and revising an expert report by the end of May 2022. (There is no indication that Dr. Marcus sent a draft report to the attorneys before the end of May 2022.) On or about June 2, 2022, Mr. Ragsdale, Ms. Espy, and Dr. Marcus again conferred for roughly one hour. Over the next few weeks, Dr. Marcus continued to review literature and to draft her rebuttal report. On June 27,

2022, Mr. Ragsdale studied and edited Dr. Marcus's report for approximately four hours. Dr. Marcus edited the report on July 1, 2022 (0.5 hours). Mr. Ragsdale revised the report again, spending 2.3 hours. Entry for July 6, 2022. Dr. Marcus performed a final edit on July 6, 2022 (1 hour).

Altogether, Dr. Marcus spent approximately 9.0 hours, worth $4,500 for preparing her third report. Legal professionals spent approximately 20.0 hours, worth more than $9,000.00.

Given that Dr. Marcus is well-educated, it is possible that she could write a three-page report in approximately 9 hours by herself. Thus, all her time is credited as reasonable. The question then becomes it is reasonable for the legal professionals to spend more than twice the time that Dr. Marcus spent? The undersigned finds that a portion of this additional time is excessive. The undersigned will reduce the time by half, allowing an approximate one-to-one ratio between expert and attorney. Accordingly, $4,500.00 is removed from the attorneys' fees.

i)      *Reply Brief regarding Entitlement*

The Secretary challenged Ms. Faulkenberry's entitlement to compensation. Resp't's Br., filed Feb. 2, 2023. The brief is approximately 54 double-spaced pages.

Mr. Ragsdale and Ms. Espy prepared Ms. Faulkenberry's reply. The paralegal assisted as well, although these entries do not inform what was being done. See entry for March 27, 2023 ("continued edits and additions to reply brief"). It is not entirely clear why a paralegal was editing a document drafted by two attorneys.

The reply brief is approximately ten double-spaced pages with additional space for a signature block and certificate of service. Pet'r's Reply, filed Mar. 23, 2023. Again, the quality of the reply is fine.

For their work, the legal professionals have invoiced for approximately 30 hours of work, valued at approximately $13,600.00. Much like finding for the primary entitlement brief, the amount of time spent exceeds a reasonable amount of time for attorneys with the experience and hourly rates of Mr. Ragsdale and Ms. Espy. For example, Mr. Ragsdale spent time to study cases discussing the burden of proof such as Boatmon. Entry for Mar. 27, 2023. But, the Federal Circuit

issued <u>Boatmon v. Sec'y of Health & Hum. Servs.</u>, 941 F.3d 1351 in 2019.  Thus, Mr. Ragsdale should already be familiar with it.

Overall, for the reply brief only a smaller reduction is warranted.  In the undersigned's experience, a reduction of $3,000 is warranted.

### j)    Motion for Review

Ms. Faulkenberry was found not entitled to compensation.  Entitlement Decision, issued Nov. 1, 2024.  She failed to establish a persuasive theory to explain how the hepatitis A and/or flu vaccines can cause anti-NMDAR encephalitis.  2024 WL 4892507.

Among the first tasks after the entitlement decision was issued was that Ms. Espy conferred with an "appellate committee" on two dates with each conference lasting for two hours.  Entries for Nov. 4, 2024 and Nov. 7, 2024.  The undersigned understands that the "appellate committee" refers to members of the Vaccine Injured Petitioners Bar Association who are willing to advise other attorneys about the potential success of a motion for review.  See www.vipbar.org.

Mr. Ragsdale and Ms. Espy decided to pursue a motion for review with Ms. Espy drafting the brief.  Unfortunately, unlike most entries associated with drafting the entitlement brief and reply brief, most entries associated with drafting the motion for review lack specificity.  <u>E.g.</u> entry for Nov. 22, 2024 (4 hours for "Continued research and study of caselaw in support of arguments for review); entry for Dec. 2, 2024 (4 hours for "Draft motion for review – all sections").

This vagueness interferes with an assessment of the reasonableness of the time charged.  The motion for review builds upon the other submissions drafted by Mr. Ragsdale and Ms. Espy.  Portions of Ms. Faulkenberry's motion for review also resemble portions of motions for review filed by petitioners represented by attorneys who are members of the Vaccine Injured Petitioners Bar Association.  To be clear, as long as non-public information is redacted, the sharing of briefs is not necessarily prohibited.  The problem is when it is difficult to determine from Ms. Espy's time entries which portions of the brief she wrote originally, and which portions come from other sources.

Overall, the legal professionals spent approximately 45 hours on the motion for review with an overall charge of approximately $20,000.00.  To account for the vagueness in most entries, five hours of Ms. Espy's time are eliminated.  Five

hours is the equivalent of $2,250.00.  Otherwise, all other time is credited as reasonable.

k)    *Potential Federal Circuit Appeal*

The Court denied the motion for review.  Opinion and Order, issued April 24, 2025.  The Opinion and Order is approximately 11 single-spaced pages.

On the day the Opinion and Order issued, each attorney spent more than half an hour either "review[ing]" the Opinion and Order (Mr. Ragsdale) or "study[ing]" the Opinion and Order.  Ms. Espy spent approximately 3.5 hours further researching.  Then, Mr. Ragsdale also spent another 1.5 hours assessing the appellate options.  Altogether, the legal professionals spent approximately 6.6 hours on reviewing the Opinion and Order and determining whether to appeal.

In the undersigned's experience, attorneys in the Vaccine Program do not usually spend this much time determining whether to appeal.  This task is another example in which Mr. Ragsdale's and Ms. Espy's work overlapped.  To account for inefficiencies and excessiveness, half the time will be removed, and half the time will be credited.  This finding causes a reduction in the amount of $1,694.00.

l)    *Fee Preparation*

The final phase of the case was preparing the pending motion for attorneys' fees and costs.  The legal professionals have charged for more than 10 hours of work at a value exceeding $2,000.00.  These activities are accepted as reasonable.

m)    *Summary regarding Attorneys' Fees*

| Original Request for Attorneys' Fees | | $183,861.00 |
|---|---|---|
| Reductions | | |
| Duplication (General) | $500.00 | |
| Excessive Charges (General) | $500.00 | |
| Clerical | $3,000.00 | |
| First Expert Report | $4,000.00 | |
| Second Expert Report | $2,000.00 | |
| Initial Brief | $20,000.00 | |
| Onset Material | $1,000.00 | |
| Third Expert Report | $4,500.00 | |

23

| | | |
|---|---|---|
| Reply Brief | $3,000.00 | |
| Motion for Review | $2,250.00 | |
| Potential Federal Circuit Appeal | $1,694.00 | |
| Fee Preparation | $0.00 | |
| Total Reductions | $42,444.00 | |
| Awarded | | $141,417.00 |

### B.    Costs Incurred

Like attorneys' fees, a request for reimbursement of costs must be reasonable. Perreira v. Sec'y of Health & Human Servs., 27 Fed. Cl. 29, 34 (Fed. Cl. 1992), aff'd, 33 F.3d 1375 (Fed. Cir. 1994). Ms. Faulkenberry requests a total of $11,792.17 in attorneys' costs. Pet'r's Mot. at 11. This amount is comprised of acquiring medical records, the Court's filing fee, postage costs, literature costs. Ms. Faulkenberry also requests $899.50 for videotaping the witness statements. These costs are all accepted.

Ms. Faulkenberry also requests compensation for Dr. Marcus. Dr. Marcus has requested compensation at a rate of $500.00. This rate is appropriate for a pediatric neurologist. Dr. Marcus has charged for 19.25 hours. As set forth above, all of Dr. Marcus's time is credited. Thus, she is awarded $9,625.00.

## V.    Conclusion

The Vaccine Act permits an award of reasonable attorney's fees and costs. 42 U.S.C. § 300aa-15(e). Accordingly, the undersigned awards attorneys' fees and costs as follows: a lump sum of **$153,209.17** (representing $141,330.85 in attorneys' fees and $11,792.17 in attorneys' costs) to be paid through an ACH deposit to petitioner's counsel's IOLTA account for prompt disbursement.

The Clerk's Office is instructed to enter judgment in accord with this decision unless a motion for review is filed. Information about filing a motion for review, including the deadline, can be found in the Vaccine Rules, which are available on the website for the Court of Federal Claims.

**IT IS SO ORDERED.**

s/Christian J. Moran
Christian J. Moran
Special Master